**LOUISIANA–PACIFIC CORPORATION, as successor to Kirby Forest Industries, Inc., Appellant,**

v.

**Luis ANDRADE, and Travelers Indemnity Co. of Rhode Island, Appellees.**

**No. 09–96–087 CV.**

Court of Appeals of Texas, Beaumont.

Submitted Oct. 30, 1997.

Decided March 12, 1998.

Rehearing Overruled April 2, 1998.

Howard L. Close, Orgain, Bell & Tucker, Beaumont, for appellant.

Cris E. Quinn, Reaud, Morgan & Quinn, Inc., Beaumont, for appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

BURGESS, Justice.

Luis Andrade filed suit against Kirby Forest Industries, Inc. (Kirby) and Louisiana–Pacific Corporation (Louisiana–Pacific) for personal injuries sustained February 14, 1990, while working for Patton Asbestos Company. Patton Asbestos was hired to remove asbestos from a powerhouse located at Kirby's facility in Silsbee, Texas. Kirby had merged with Louisiana–Pacific by the time of trial. The jury returned a verdict against Kirby for negligence and found Kirby grossly negligent. Andrade was awarded $2,500,000 in actual damages and $2,500,000 in punitives. Andrade and Louisiana–Pacific (Kirby's successor in interest) settled the actual damages portion of the case but Louisiana–Pacific reserved the right to appeal the punitive damages and issues relating to gross negligence. Louisiana–Pacific appeals from the final judgment awarding punitive damages.

In their first point of error Louisiana–Pacific contends the trial court erred in failing to direct a verdict in their favor and in failing to grant their motion for judgment notwithstanding the verdict because no evidence supported the jury's findings of gross negligence or the award of punitive damages. In order to adequately consider this point, the evidence adduced at trial regarding negligence is set forth below.

## THE EVIDENCE

Lucas Martinez testified by deposition that George Chappa instructed he and Andrade to recover the windows with plastic. According to Martinez, Chappa and Don Herrin knew Martinez could not read English.[1] Martinez testified Chappa told them to use a ladder to get up to all the windows but did not say anything about the rails.[2] Chappa told them

there was no danger, that the electricity had been cut off. Martinez said Andrade placed his ladder against the rails and climbed up. Andrade then grabbed the rails, which were live, throwing him off the ladder. Before the sheriff came, Martinez saw a Kirby employee turn off the crane. Martinez said the area where the man went to turn off the crane was covered in poly when he and Andrade arrived at work. Martinez testified there was no way to reach the windows that needed recovering except to place the ladder near the rails.

· Luis Andrade testified he put a ladder on the metal beam in order to put plastic on the windows. When he reached the beam with his right hand, he received an electric shock. Andrade did not remember anything after that until he woke up in Hermann Hospital. Andrade testified it was his first day on the job and George Chappa was his supervisor. Chappa told him to repair the windows because the plastic had come down. Andrade said the crane was supposed to be turned off and he did not know the crane was energized. Andrade testified he was hired by Chappa to work for Patton Asbestos who provided the tools needed for the job. According to Andrade, Chappa told him what work to do that morning and no one from Kirby gave him any instructions. Also, he did not see anyone from Kirby in the powerhouse before the accident. Andrade testified no one gave him any safety training that morning before he started work. Chappa told him to climb up to the windows to repair the poly that was loose but did not give him any instructions on the best way to reach those windows. Chappa was not anywhere on the second floor where Andrade was working when he started climbing the ladder. No one was holding the ladder and Andrade did not have any type of safety belt or lanyard to tie off with.

Counsel for Andrade then introduced evidence via testimony of several witnesses regarding lock-out/tag-out procedures at other plants. The consensus was to have written lock-out/tag-out procedures and provide

---

1. Martinez does not speak English either.

2. The crane involved was an overhead crane that operated on electrified rails.

training on those procedures. Additionally, contractors were not responsible for locating sources of energy and locking them out, the company for which they were working ensured the equipment that contract workers were around was de-energized. Also, Ray Loupe, a safety professional for Serv–Tech, Inc., testified at length regarding proper lock-out/tag-out procedures.

Following this testimony, Andrade's counsel read into the record the response to an interrogatory asking what warnings were given to Andrade or Patton Asbestos regarding the danger presented by the overhead crane, Kirby said safety was the responsibility of Andrade and his employer and they had no record as to what specific warnings were given. A supplemental answer stated there are warning signs in the area of the crane rails which say "Danger, High Voltage." Further, that Ollie Pike walked through the area with the supervisor for Patton Asbestos and discussed the overhead crane; that Mike Gregory locked out the overhead crane prior to Kirby vacating the building; that the building was then in the possession and control of Patton Asbestos and safety was their responsibility during that period when Patton Asbestos was in charge of that building.

Testimony resumed with Ronald Paul, general manager and vice-president of operations for Louisiana–Pacific and former president of Kirby Forest Products. Paul testified Ollie Pike was the Kirby employee responsible for safety at the plant in February 1990. Paul was not aware of any written safety rules or regulations or lock-out procedures specifically for the power plant at the Kirby facility where Andrade was injured in February 1990. According to Paul, in February 1990 Kirby did not have any written company-wide safety rules, including company-wide written procedures for locking out electrical equipment. Paul acknowledged a lock-out procedure is a safety factor. Paul testified if it was not a Kirby employee working near the overhead crane, it was not Kirby's responsibility to lock-out the crane. The contractors were responsible for de-energizing the crane and it was up to them to have safety rules; Kirby was not responsible for the contractor's

safety, the contractor was. According to Paul, Kirby did not have a corporate policy regarding what contractors should be told about potential safety hazards in the power plant. Paul disagreed with Pike if it were Pike's opinion that it was Kirby's responsibility to de-energize the crane.

Edward Kelley, employed by Louisiana–Pacific, testified that during the period of time he worked at the Kirby plant, up to February 1990, he never saw any sort of written lock-out/tag-out procedure for the power plant. Further, he never attended any safety meetings where lock-out/tag-out procedures were discussed before Andrade's accident. In 1989, Kelley was told to lock out the crane in the power plant. After doing so, he did not check in with anybody and did not tell Pike or any of the operators he was going to be turning off the crane. To lock-out the crane, Kelley turned the circuit breaker off and put on a lock and a "Do not operate" tag with his name and date. The keys to the lock were left on the foreman's desk in the power plant. Kelley's testimony indicates there was no procedure to document how the key should be controlled. Kelley testified that if a man was working on the equipment, he would keep the key but if it were a long-term lock-out, whoever furnished the lock would have the key. To his knowledge, Kelley was not informed when the lock or tag was being taken off. Kelley testified that rather than using a lock, some switch gears were just turned off and wires put through them to keep them from being turned back on easily. Kelley believed it was Kirby's responsibility to make the crane safe. Kelley never entered the powerhouse during the time the asbestos abatement contractors were there and never used the overhead crane during that time. When Kelley left the keys to the lock in late 1989 in the foreman's office, he understood that if they needed to use the crane, they would take that lock off. Kelley testified that he was familiar with how to lock out or tag out equipment and that when he went to work on a piece of machinery, he would lock it out. Kelley agreed that in February of 1990, there was still power to the overhead crane and it could still operate if the breaker was turned on. Kelley agreed it would be a reasonable re-

quest for the asbestos abatement contractor to ask Pike to turn off the power to the crane. It was Kelley's testimony that if requested, he would expect Pike or any other Kirby foreman to lock out the crane. According to Kelley, during that time frame if someone needed something done in the powerhouse Pike was the person they would go through. When asked if there was any way to lock out the crane in addition to using a lock, Kelley said the lead could be taken off the bottom of the breaker. Kelley said it would take a couple of minutes to take the leads off the bottom of the breaker.

David Jones worked for Kirby at the time of Andrade's accident in the power plant. Based on his ten years' experience in the power plant, Jones said there was no way for Andrade to have been electrocuted had the power to the overhead crane been turned off and locked out. Jones never saw any sort of written lock-out procedure in his ten years working inside the power plant. Including the time he was an operator, head operator, and foreman, Jones was never given a lock to use in locking out electrical equipment. Jones did not observe anyone from Kirby checking to see if the overhead crane was locked out at the time of Andrade's accident or shortly thereafter. When asked if he had anything to dispute Pike and Gregory's claim they locked out the crane, Jones said he did, "The man getting electrocuted...." Jones was in the powerhouse the day before the accident sometime around 3:00 or 4:00 p.m. He did not recall hearing anyone from Kirby tell anyone else to make sure the breaker was turned off but had heard Pike and Gregory discussing turning the power off to the crane. Jones did not check to see if the main breaker was still on when he left the powerhouse that day.

Michael Gregory, power plant manager for Louisiana–Pacific in Silsbee, testified Pike asked him to lock out the crane the last day Gregory was at the power plant. Gregory could not recall if that was three or four days before the accident. Pike did not tell Gregory why he wanted the crane locked out. Gregory said "It was an obvious safety hazard. So, that's the reason why it was locked out." Gregory said he knew the contractors

doing the asbestos abatement work were going to have to put plastic up over the windows and in doing so would have to be working around and above the bus bars. Gregory testified he locked out the crane by turning the breaker off, putting a hasp in the opening inside the handle, closing the hasp, putting a lock on, closing the lock, and removing the key. Gregory did not tag the lock. Gregory said he did not use a tagging procedure, just locks. Gregory did not recall reading any written lock-out/tag-out procedure. Gregory gave the keys to the lock to Pike. There was no procedure for documented key control at the power plant. Pike was in his office in the power plant when Gregory gave him the keys. Gregory was never given any training on a written lock-out/tag-out procedure for the overhead crane. Gregory acknowledged the importance of controlling a key when a piece of equipment has been locked out is that "You don't want the keys floating around for anybody to get to" and to make sure the crane stays locked. Gregory said he had his own lock and used it to lock out the crane. Gregory did not recall receiving any training in using a tag to lock out equipment. When asked whose responsibility it was to de-energize the crane to make it safe for the asbestos abatement workers, Gregory said it must have been Kirby's "because we did lock out the piece of equipment." Gregory and Pike were the first Kirby employees to arrive at the scene of the accident. Gregory checked the power to the overhead crane and found the breaker had been turned on. Gregory then turned the power off. Gregory testified the power had been turned off before Andrade's accident stating, "I locked it up myself."

Harold Williams, plant accountant for Louisiana–Pacific, testified he never attended any safety meetings at the Silsbee plant after January 1, 1987, when Louisiana–Pacific purchased the plant.

Ollie Pike, manager of general services for the Silsbee facility at the time of the accident, testified he and Gregory took Herrin through the power plant and showed him "every known hazard that they would encounter while work was going on inside those two floors." Pike said he showed Herrin the

exposed rails on the overhead crane and all the electrical hazards. Pike testified the signs saying "Danger, High Voltage" were up in 1990. Pike showed Herrin where the motor control centers were and where the crane locked out. Pike told Herrin they would secure the crane with a lock and test it and said that was done the afternoon before Andrade's accident. Pike stated he witnessed Gregory locking out the crane the evening of the thirteenth with "a standard hasp and a lock and a tag." Pike took the keys and gave them to Keith Rogers, who tagged them and kept them in his possession.[3] According to Pike, the crane was locked out on the thirteenth after using it that morning to lift some things up to the second floor. Gregory went over and tested it with the switches and it was hung up in its rack. Pike testified he was the person to contact if someone needed anything in the power plant and he was the person Herrin was to contact if anything outside the contract was needed. Pike was not in the building when the accident happened. Pike said there were safety procedures for the power plant and written lockout procedures but was unable to locate any of those procedures. Pike said safety meetings were conducted.

Donald Herrin was employed by Patton Asbestos to supervise the removal of asbestos at the Silsbee facility. Herrin's contact person at the plant was Pike. Herrin was to coordinate with Pike if he needed any material or anything turned on or off. Herrin testified when Patton Asbestos originally took the building over, it was explained to Pike that they needed to lock all the doors so that no one not connected with Patton Asbestos could enter the facility. According to Herrin, the arrangements for the crane would have been made with Pike. Apparently, sometime between the fifth and the tenth of February, Herrin used the crane to drag the decontamination unit into the building. Herrin and Oscar checked the breaker panel the morning of the accident and the disconnect switch for the crane appeared to be in the off position. Herrin said he would have checked it sometime between 6:30 and 7:00

a.m. while Oscar would have noticed it between 7:00 and 8:00 a.m. Herrin said Oscar expressed to him after the accident that he looked at it and it appeared to be off. Herrin testified he did not at any time see any lock-out devices, either Patton Asbestos' or Louisiana Pacific's. Herrin said if it had been his project, he would have locked it out. If he had put his lock-out device on, Louisiana–Pacific's people could not do their work without him. Herrin acknowledged that is probably what should have been done. Herrin did not see anyone turn the power off to the crane at the controller, he had been told that it was de-energized and when he tried the control block to energize the crane to make sure it was off, it would not move. The morning of the accident Herrin did not check the control block, he just looked at the disconnect and it appeared to be off. Herrin periodically checked the control block, but not the morning of the accident. Herrin said nothing was explained to Andrade about the electrical equipment except that it was off. Herrin said the men wanted to use the crane to stand on but were told it would not work and was not going to be used in that manner, they had to use ladders. Herrin said they did not know how to turn the crane on. To the best of Herrin's knowledge, the men doing the repair work on the windows were not present at any time that the crane was used. The discussion with the workers about not using the crane took place before Andrade got there. Herrin did not remember using the crane the day before the accident. He said the crane would have been de-energized the day before the accident and totally covered. According to Herrin, to turn the crane on in order to use it, you would have to break the Visqueen[4] barrier and that was not done. Herrin testified the panel box shown on Exhibit No. 9 was not the control panel he was shown. Herrin never went to the area depicted in Exhibit No. 9. If, in fact, the lockout device to the overhead crane is depicted in Exhibit No. 9, someone at Kirby showed Herrin the wrong lockout device.

George Chappa, the supervisor for Patton Asbestos at the Kirby plant, testified he had

---

**3.** Rogers died of a congenital heart problem the summer of 1990.

**4.** The plastic used to cover the seal off the electrical equipment.

worked with Andrade before and he was a good, competent worker. Chappa said the power is normally turned off or locked out by whoever the abatement contractor is working for. Before Andrade's accident, Herrin told Chappa that he was told the power was turned off. Chappa testified regarding two other jobs that he did not have to turn off the power and was not required to come around behind the plant owner to make sure all of the power had been turned off. Chappa testified he has never put his own lock on a breaker or box. According to Chappa, the day before the accident, the asbestos abatement workers had no reason to use the crane. The heavy equipment needed upstairs was carried up by the men. Chappa was not aware of a potential hazard due to electricity in the overhead crane when he sent Andrade up to fix the windows. Chappa claimed to be relying on the fact that Kirby was supposed to have turned off the power. Chappa did not know where to go to turn the power off to the crane. Chappa said that to ensure something is de-energized, he would talk to the head guy in charge of the building or jobsite, in this case, Kirby. Chappa said the crane was never used during the period of time he was there. Herrin walked through the jobsite with Chappa the first day he went out there and told Chappa, "All power will be turned off." The next day, Herrin said all power was off. Chappa did not go through and check the electricity in any way to make sure it was off. Chappa did not instruct Andrade on how to reach the windows.

## GROSS NEGLIGENCE

"The finding of gross negligence will be upheld if there is legally sufficient evidence (1) the defendant's conduct created an extreme risk of harm and (2) the defendant was aware of the extreme risk." *Mobil Oil Corp. v. Ellender*, 934 S.W.2d 439, 448 (Tex. App.—Beaumont 1996, writ granted)(citing *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex.1993)). Louisiana–Pacific challenges both the objective and subjective prong.

Extreme Degree of Risk

Extreme risk is satisfied by showing likelihood of serious injury. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex.1994). Applying this to the present case—there must be some evidence that Kirby's failure to lock out the crane created an extreme risk to Andrade and that such risk exceeded remote possibility, creating a likelihood of serious injury. *See Mobil*, 934 S.W.2d at 449. Louisiana–Pacific argues only that there is no evidence Kirby failed to lock out the crane. Louisiana–Pacific does not question that when the crane rails were electrified, the probability of serious injury to any worker coming in contact with them was almost a certainty.

Although Mike Gregory testified he locked the crane out his last day at the power plant, three or four days before the accident, it is undisputed the crane was electrified. Gregory testified he looked at the crane after the accident and discovered the power to the crane was on. It is undisputed the crane was, in fact, not locked out at the time of the accident.

Louisiana-Pacific attempts to persuade this court it was not Kirby who unlocked the crane but concedes in their brief that no evidence was produced as to who actually unlocked the crane. Louisiana–Pacific argues there was no evidence that Keith Rogers, the individual with the key to unlock the crane, was present between the time Gregory locked out the crane and the time of the accident. Louisiana–Pacific points to the log book showing that Rogers had not signed into the fenced area of the plant. However, there is no evidence anyone other than Kirby employees had access to the keys to unlock the crane. From this, the jury could have determined no one but a Kirby employee could have unlocked the crane.

The jury heard the evidence and determined Kirby failed to lock out the crane prior to Andrade appearing for work. The simple fact that the crane was not locked out at the time of the accident is some evidence from which a reasonable trier of fact could find Kirby failed to lock out the crane. As there is no question that the energized crane creat-

ed an extreme degree of risk, we find the objective prong of *Moriel* is satisfied.

### Awareness of Extreme Risk

◼ *"Moriel's* subjective component may be proven by direct or circumstantial evidence." *Mobil,* 934 S.W.2d at 452 (citing *Moriel,* 879 S.W.2d at 23). Louisiana–Pacific argues there is no evidence Kirby knew the crane was energized the day of the accident. We agree there is no *direct* evidence Kirby was aware the crane was unlocked. However, there is circumstantial evidence from which the jury could find Kirby possessed awareness of the risk.

Mike Gregory testified he locked out the crane and gave the key to Ollie Pike. Pike testified he saw Gregory lock out the crane and took the keys from him. Pike then gave the keys to Keith Rogers to keep in his possession. As noted above, there is no evidence anyone besides a Kirby employee could have unlocked the crane. From this, the jury could determine a Kirby employee unlocked the crane and was thus aware the crane was unlocked and energized.

◼ Also, even though the evidence was uncontroverted that Gregory locked out the crane, the jury could determine the crane was never locked out. The right to determine credibility lies exclusively with the jury and resolving the conflict shown is a jury function. *Fredonia State Bank v. General Am. Life Ins. Co.,* 884 S.W.2d 167 (Tex. App.—Tyler 1992) *rev'd on other grounds,* 881 S.W.2d 279 (Tex.1994). Gregory said he locked out the crane three or four days before the accident while Pike was adamant it was the day before. Pike said there were written lock-out procedures for the facility but Ronald Paul, Edward Kelley, David Jones, and Michael Gregory all testified they never saw any written lock-out procedures. Pike testified the crane was locked out the day before the accident after it had been used to lift things up to the second floor. Donald Herrin did not recall the crane being used that day and George Chappa said it was not; the men carried the equipment they needed up the stairs.

◼ There was clearly conflicting evidence. There was evidence the crane was locked out but, in fact, the crane was not locked out. The jury could determine either the crane was unlocked or that it was never locked out to begin with. Controverted trial issues are properly within the province of a jury if reasonable minds could differ as to the truth of the controlling facts. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). Whether the crane was never locked out or was subsequently unlocked, Kirby employees would have been aware the crane was energized and hence aware of the risk. We find the second prong of *Moriel* is satisfied. Point of error one is overruled.

◼ Louisiana-Pacific's second point of error alleges the trial court erred in failing to grant a new trial because the evidence is factually insufficient to support a jury finding of gross negligence and punitive damages. As this court noted in *Ellender,* "[f]actual insufficiency or great weight and preponderance review in gross negligence cases applies where the *amount* of punitive damages awarded has been preserved." *Mobil Oil Corp.,* 934 S.W.2d at 448. If the record contains legally sufficient evidence of gross negligence, we may not reverse the trial court's judgment. *Id.* at 447. Louisiana–Pacific does not challenge the *amount* of punitive damages, but the award of punitive damages. Consequently, a factual sufficiency review of the evidence is inappropriate. Point of error two is overruled.

◼ Point of error three contends the trial court erred in denying motions for mistrial because introduction of a prior accident on February 13, 1990, at Kirby was improper and constitutes reversible error as no foundation of similar facts was laid. We agree that substantial similarity was not established. Our inquiry does not end there, however.

Error is not reversible unless it "was reasonably calculated to cause and probably did cause· rendition of an improper judgment in the case, or was such as probably prevented the appellant from making a proper presentation of the case to the appellate court." TEX. R. APP. P. 81(b)(1). As Louisiana–Pacific's brief recognizes, the prior accident was introduced only to establish Kirby's failure to

investigate accidents involving non-Kirby employees. The testimony about the prior accident consisted of answers to questions asked of Ray Loupe and Ollie Pike regarding an accident at the plywood mill the day before Andrade's accident: Pike testified he learned of the injury after lunch that day and from then until Andrade's accident no investigation was conducted, and in answer to a hypothetical question Loupe said failure to investigate an injury to a subcontractor's employee would not be good corporate safety practice. Counsel for Andrade stated the evidence was being tendered for the limited purpose of showing Kirby's state of mind regarding contractor safety immediately before Andrade's accident. The trial court allowed the questions for that purpose with a limiting instruction to the jury.

None of the specifics regarding the prior accident were introduced; not the type or extent of injury, the cause of the accident, or even what precisely occurred was revealed to the jury. The jury was made aware only that an accident had occurred and had not been investigated. We find any error in allowing the questions was not such an error as to probably cause rendition of an improper judgment. *See Beavers on Behalf of Beavers v. Northrop Worldwide Aircraft Services, Inc.,* 821 S.W.2d 669, 678 (Tex.App.—Amarillo 1991, writ denied). Point of error three is overruled.

Louisiana-Pacific's final point of error claims "[t]he charge to the jury was confusing and improper because two issues of gross negligence were submitted under two negligence theories and because it did not instruct the jury on the proper premises liability law." The charge submitted to the jury for determining the amount of punitive damages for gross negligence was limited to premises liability. Louisiana–Pacific's contention that the charge was submitted under the additional theory of ordinary negligence is incorrect. We find the charge on punitive damages was properly submitted. Point of error four is overruled.

The judgment of the trial court awarding punitive damages is affirmed.

AFFIRMED.

WALKER, Chief Justice, dissenting.

I respectfully file this dissent to the majority opinion, believing, under law and fact, that a rendition on the question of gross negligence is the proper holding. I would hold that the trial court erred in failing to grant Louisiana–Pacific and Kirby's motion for directed verdict and motion for judgment notwithstanding the verdict.

A no evidence point must be sustained if the court finds a complete absence of evidence to support the verdict or only a scintilla of evidence exists to support it. *McKnight v. Hill & Hill Exterminators,* 689 S.W.2d 206 (Tex.1985). Where we conclude that the evidence is legally insufficient to support the jury verdict, we must render for appellant. TEX. R.APP. P. 81(c); *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176 (Tex.1986).

I part ways with the majority in its analysis of the legal sufficiency of the evidence to sustain what is referred to as the "subjective" prong of the jury's gross negligence finding. The two-prong concept of gross negligence is explained in *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 21 (Tex. 1994), as follows:

Gross negligence thus involves two components: (1) the defendant's act or omission, and (2) the defendant's mental state. As defined, the act or omission element must involve behavior that endangers the rights, safety, or welfare of the person affected. [footnote omitted] TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(5) (Vernon Supp.1994). Gross negligence, then, differs from ordinary negligence with respect both elements—the defendant must be "consciously indifferent" and his or her conduct must "create an extreme degree of risk." *Williams [v. Steves Indus., Inc.],* 699 S.W. [570,] at 573 [(Tex.1985)]; *see also Wal–Mart [Stores Inc. v. Alexander],* 868 S.W.2d [322,] at 326 [(Tex.1993)] ("We reaffirm that a gross negligence finding may be upheld on appeal only if there is [legally sufficient] evidence that a) the defendant's conduct created an extreme risk of harm, and b) the defendant was aware of the extreme risk.")

As we have recently reiterated, the test for gross negligence "contains both an objective and a subjective component." *Wal–Mart,* 868 S.W.2d at 326. Subjectively, the defendant must have actual awareness of the extreme risk created by his or her conduct. *Id.* Objectively, the defendant's conduct must involve an "extreme degree of risk," a threshold significantly higher than the objective "reasonable person" test for negligence. *Id.*

The *Moriel* Court summarized the "subjective component" by requiring proof that the actor have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *Id.* at 23.

In the instant case, the majority correctly observes that *Moriel's* subjective prong may be proven by direct or circumstantial evidence. *See Moriel,* 879 S.W.2d at 23. The majority then summarizes the testimony from a number of witnesses regarding whether or not the electrified crane was locked out on the day of, or several days prior to, the accident. The majority then comes to the following conclusion:

> There was clearly conflicting evidence. There was evidence the crane was locked out but, in fact, the crane was not locked out. The jury could determine either the crane was unlocked or that it was never locked out to begin with. Controverted trial issues are properly within the province of a jury if reasonable minds could differ as to the truth of the controlling facts. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). Whether the crane was never locked out or was subsequently unlocked, Kirby employees would have been aware the crane was energized and hence aware of the risk. We find the second prong of Moriel is satisfied.

I do not take issue with the majority's factual summary of the events surrounding the accident. It clearly cannot be disputed that the crane was energized when Andrade came in contact with it. This means that at some point the crane was unlocked by someone, energized, and then not de-energized and re-locked. I have no problem with the inference from the evidence that a Kirby employee must have been responsible for unlocking, energizing, and failing to re-lock the crane. However, the contradictions notwithstanding, all of the testimony indicated that the Kirby employees involved in the chain of the lock-out process *actually, subjectively* believed that they personally had either locked-out the crane, *or* that their personal subjective recollection of various events led them to believe that the crane had been locked-out by someone prior to Andrade beginning work on the day in question. Andrade's trial counsel read into the record the fact that there were warning signs in the area of the crane rails stating, "Danger, High Voltage," and that Ollie Pike of Kirby walked through the area with Andrade's supervisor and discussed the overhead crane. The clear import of the evidence was that everyone, Kirby personnel as well as employees of Patton Asbestos, was aware of the existence of the *potential* risk the crane posed in the event it was energized, but as far as both Kirby and Patton Asbestos personnel were concerned, the inference was that there was no risk in working near a *de-energized* crane.

What is further lacking from the evidence, even inferentially, is proof that any Kirby personnel were *consciously indifferent* to the risk of electrocution if the crane was energized. So long as the evidence reflects that Kirby personnel were attentive to the risk, admittedly to a greater or a lesser degree, how can it be said that they acted with conscious indifference to the safety or welfare of Andrade? I believe that it is not enough to find, as does the majority, the inference of knowledge on Kirby's part without also finding at least an inference of conscious indifference. Again, all of the testimony indicates "actual, subjective awareness" that the crane was de-energized at the time Andrade began working. Even a visual check of the breaker panel by Donald Herrin, a Patton Asbestos supervisor, on the morning of the accident indicated that the disconnect switch appeared to be in the off position. Under all of the facts and circumstances in the record, I cannot say that a fact issue has been raised that Kirby had either the "actual, subjective awareness of the risk involved," or the conscious indifference to

any such risk required to sustain the gross negligence finding. Thus, my dissent.