**Donna HALL, Appellant,**

v.

**DIAMOND SHAMROCK REFINING CO., L.P., Diamond Shamrock Refining and Marketing Co., Diamond Shamrock, Inc., Sigmor Corp., and Ultramar Diamond Shamrock Corp., Appellees.**

No. 04–99–00370–CV.

Court of Appeals of Texas, San Antonio.

June 27, 2001.

Rehearing Overruled May 10, 2002.

8

John N. McCamish, Jr., McCamish, Socks & Montpas, P.C., San Antonio, Robert E. Garner, Garner & Stein, L.L.P., Amarillo, for appellant.

John H. Davis, Shaddox, Compere, Walraven & Good, San Antonio, Daryl G. Dursum, Erin H. Patterson, Adams & Reese, L.L.P., Houston, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, PAUL W. GREEN, Justice.

Opinion by: ALMA L. LÓPEZ, Justice.

This appeal arises from a survivor's cause of action for punitive damages. Appellant, Donna Hall ("Hall") appeals the trial court's judgment, which capped her recovery of punitive damages. Appellees, Diamond Shamrock Refining Co., L.P., Diamond Shamrock Refining and Marketing Co., Diamond Shamrock, Inc., Sigmor Corp., and Ultramar Diamond Shamrock Corp., ("Diamond Shamrock") cross-appeal the jury verdict. Because we find that the trial court abused its discretion, we reverse the judgment of the trial court and remand the cause for a new trial.

### FACTUAL AND PROCEDURAL BACKGROUND

On April 1, 1996, an explosion and fire occurred at Diamond Shamrock's refinery in Moore County, Texas, at the McKee Plant in the Refinery Light Ends ("RLE") compressor building. Diamond Shamrock was a self-insured subscriber under the Texas Workers' Compensations Laws of the State of Texas. Charles Otis Hall ("Charles") was an employee of Diamond Shamrock working at the refinery when the explosion occurred.

The fire was caused when the first stage compressor cylinder on the No. 2 RLE compressor pulled in liquid during the start-up procedure, which caused the cylinder internal bypass cover plate to crack. Hydrocarbon liquid and gas leaked from the cracked cover plate and was ignited from an unidentified source, which resulted in the fire and explosion. Three employees in the feed prep unit—Ellis Thornburg, Charles Hall, and Kevin Smith—were severely injured and sent to the Lubbock Burn Center. As a result of the explosion, Charles received third degree burns over fifty percent of his body, which caused his death eight days later on April 9, 1996.

The sequence of events show that on April 1, 1996, at 11:00 a.m., the hydrocracker unit was in the process of starting up. During the process of starting up, the hydrocracker fractionator overhead accumulator that normally vents vapors started carrying liquid into the RLE compressor first stage suction drum. The first stage suction drum has an accumulator with a pump that operates automatically to pump liquid out of the system. At 3:00 p.m., the RLE compressor first stage suction drum level alarm signaled a high level. The high level alarm was supposed to automatically shut down the engines, but the liquid level in the suction drum went above the sight glass and the operating personnel had to manually shut down the engines. The operating personnel reported that the system failed to shut down the engines on the high suction drum level. By 4:50 p.m., the suction drum level was back to normal, and liquid was not being carried into the system from the hydrocracker fractionator. During the period of time the RLE compressors were down, liquid was being pumped from the first stage suction liquid

accumulator into the first stage discharge line. During later investigations of the explosion, Diamond Shamrock found that the check valve failed and that the No. 2 RLE compressor's first stage discharge valve leaked.

At approximately 5:00 p.m., the evening operating crew was in the process of starting up the No. 2 RLE compressor engine. The evening operating crew, consisting of Ellis Thornburg, Charles Hall, and Kevin Smith, followed the written procedures to start these engines. The machine was rolled with air and started without incident. When the operating crew started to load the No. 2 RLE compressor, the discharge valve on the first stage cylinder was opened first. The pressure on the line down stream of the first stage cylinder discharge block valve was estimated to have been thirty to forty pounds. When the discharge valve was opened, the pressure in the line forced liquid out through the valve on the torch line which was still open and also through the valve on the recirculating line into the suction of the first stage compressor cylinder. The machine, which was running at the time, was trying to compress liquid instead of vapors and caused the cap to break and the ensuing fire. A very small amount of liquid was required for this to occur. The accident was caused when the first stage compressor cylinder discharge block valve leaked, and the first stage discharge check valve failed during the time both engines were down for approximately two hours due to high levels of liquid in the suction accumulator.

On August 8, 1997, Donna Hall, the surviving widow of Charles, filed suit in Bexar County pursuant to the Texas Workers' Compensation Act and Article 16, Section 26 of the Texas Constitution to recover punitive damages from Diamond Shamrock. On November 9, 1998, the jury returned a verdict for Hall in the amount of $42.5 million. Immediately after the jury was polled, Diamond Shamrock, in open court, moved for the trial court to limit the recovery of punitive damages to $200,000 pursuant to chapter 41 of the Civil Practices and Remedies Code. On November 23, 1998, Hall filed a motion for judgment on the jury's verdict. On December 7, 1998, Diamond Shamrock filed a motion for judgment notwithstanding the verdict ("JNOV"). At a hearing on December 17, 1998, the trial court heard arguments from both parties on the motions presented. The trial court denied Diamond Shamrock's motion for JNOV, denied Hall's motion for judgment, and granted Diamond Shamrock's motion made in open court to limit the recovery of punitive damages. On April 28, 1999, the trial court entered a final judgment which limited Hall's recovery to $200,000.

On appeal, Hall complains in five issues that the trial court erred in capping the jury verdict at $200,000 and in denying her motion for judgment. Diamond Shamrock complains on cross-appeal: (1) that the evidence was legally and factually insufficient to support the jury's finding of gross negligence; (2) that the trial court erred in admitting evidence of two prior explosions; (3) that the trial court erred in ruling that Diamond Shamrock operated as a single business enterprise and in admitting Dan Hanke's testimony regarding Diamond Shamrock's net worth; (4) that the jury award is excessive; (5) that there is no basis for a judgment against Ultramar; (6) that the trial court erred in awarding post-judgment interest from the date of the verdict and not from the date of the judgment; and (7) that Hall failed to satisfy the requirements of section 41.005(a) of the Civil Practices and Remedies Code. Before we address Hall's issues on appeal, we will first address Diamond Shamrock's issue on whether the evidence is legally

and factually sufficient to support the jury's finding because the outcome of this issue is dispositive of this case.

## LEGAL AND FACTUAL SUFFICIENCY

In its first issue on cross-appeal, Diamond Shamrock complains that the evidence was legally and factually insufficient to support the jury's finding of gross negligence. Specifically, Diamond Shamrock contends that Hall failed to meet the objective and subjective tests for gross negligence.

### A. *Applicable Law*

■ Gross negligence includes two elements: (1) viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and the magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7)(B) (Vernon 1997); *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998). Evidence of simple negligence is not enough to prove either the objective or subjective elements of gross negligence. *See Ellender*, 968 S.W.2d at 921. Circumstantial evidence is sufficient to prove either element of gross negligence. *See Ellender*, 968 S.W.2d at 921; *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 22–23 (Tex.1994).

■ A corporation may be liable in punitive damages for gross negligence only if the corporation itself commits gross negligence. *See Ellender*, 968 S.W.2d at 921. A corporation is liable for punitive damages if it authorizes or ratifies an agent's gross negligence or if it is grossly negligent in hiring an unfit agent. *See id.* A corporation is also liable if it commits gross negligence through the actions or inactions of a vice principle. *See Ellender*, 968 S.W.2d at 922; *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 389 (Tex. 1997). "Vice principal" encompasses: (a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom the master has confided the management of the whole or a department or a division, of the business. *See Ellender*, 968 S.W.2d at 922; *Hammerly Oaks*, 958 S.W.2d at 391.

■ In determining whether acts are directly attributable to the corporation, the reviewing court does not simply judge individual elements or facts. *See Ellender*, 968 S.W.2d at 922. Instead, the court should review all the surrounding facts and circumstances to determine whether the corporation itself is grossly negligent. *See Ellender*, 968 S.W.2d at 922; *McPhearson v. Sullivan*, 463 S.W.2d 174, 176 (Tex. 1971). Whether the corporation's acts can be attributed to the corporation itself, and thereby constitute corporate gross negligence, is determined by reasonable inferences the factfinder can draw from what the corporation did or failed to do and the facts existing at relevant times that contributed to a plaintiff's alleged damages. *See Ellender*, 968 S.W.2d at 922.

### B. *Standard of Review*

■ An appellate court must sustain a gross negligent finding if legally sufficient evidence shows both that the complained of act or omission was likely to result in serious harm and that the defendant was consciously indifferent to the risk of harm. *See id.* If there is no legally sufficient evidence of either the objective or subjective elements of gross negligence, we must reverse a gross negligence find-

ing. *See id.* Challenges to the legal sufficiency of the evidence must be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence established conclusively the opposite of a vital fact. *See Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997). In reviewing legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See Moriel,* 879 S.W.2d at 25.

 If a party is attacking the legal sufficiency of an adverse finding of an issue on which it did not have the burden of proof, the attacking party must demonstrate on appeal that there is no evidence to support the adverse finding. *See Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). In reviewing a no evidence issue, we must consider all of the record evidence in the light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deducible from the evidence is to be indulged in that party's favor. *See Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998).

 When reviewing a challenge to the factual sufficiency of the evidence, we must consider all of the evidence in the record. *See Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). If a party is attacking the factual sufficiency of an adverse finding on an issue to which the other party has the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. *See Hickey v.*

*Couchman,* 797 S.W.2d 103, 109 (Tex. App.—Corpus Christi 1990, writ denied). In reviewing an insufficiency of the evidence challenge, we must first consider, weigh, and examine all of the evidence which supports and which is contrary to the jury's determination. *See Plas–Tex,* 772 S.W.2d at 445. We should set aside the verdict only if the evidence which supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986).

## C. *Discussion*

### 1. Objective Element of Gross Negligence: Extreme Risk

 We now examine the record to determine whether the evidence is legally and factually sufficient to support the jury's finding that Diamond Shamrock's actions involved an extreme degree of risk to Charlie Hall. *See Ellender,* 968 S.W.2d at 921. Under the objective element of gross negligence, "extreme risk" is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *See id.*

Harry McAninch, an engineering consultant and Hall's expert witness, specified the reasons for the explosion on April 1, 1996:(1) liquids were pumped and pressured into the compressor system; (2) Diamond Shamrock defectively designed the system-the design incorporated putting the liquids back into the compressor system; (3) inadequate start-up procedures for the compressor; (4) inadequate training of the operating personnel; and (5) the drain valves were out of service and were covered with dirt. McAninch testified that because of these reasons, Diamond Shamrock was grossly negligent in this case. Moreover, sending liquids through a vapor

line to the feed prep unit posed an extreme degree of risk to Diamond Shamrock employees and constituted gross negligence. In fact, Diamond Shamrock knew these circumstances posed an extreme degree of risk on April 1, 1996. Diamond Shamrock's pumping design or configuration posed an extreme degree of risk to Diamond Shamrock employees. McAninch testified that Diamond Shamrock's sketch of the system clearly showed that Diamond Shamrock was pumping liquid out of the first stage suction drum right back into the first stage discharge line. According to McAninch, Diamond Shamrock created an unsafe condition for the operators when liquids were put back into a vapor system, which caused the fire and explosion and the death of Charlie Hall.

McAninch testified that check valves were for only one purpose, and that was to prevent reverse rotation of equipment. It is common industry knowledge that check valves were not designed to prevent the leakage of liquids. In fact, Diamond Shamrock management knew that check valves did not prevent the leakage of liquids. For example, Shannon Gillespie, the feed prep plant superintendent, said that the check valve allowed liquids to back-up through the discharge line. Kenneth Sorenson, Ph.D., an engineering consultant and expert witness for Diamond Shamrock, testified that the check valve is considered a safety feature to protect the compressor, but agreed that check valves leak and are not usually relied upon as a leak-tight device. According to Sorenson, there is an expectation that there will be some leakage past check valves. Check valves are not designed to create a leak proof seal for liquids or gas. In addition, Sorenson agreed that getting hydrocarbon liquids into the suction side of an operating compressor is an extremely dangerous situation and could be deadly.

Diamond Shamrock's management and operating personnel knew of the risk involved when liquids entered into the compressor system. Bob Kerns, Vice President of Operations for Ultramar Diamond Shamrock, admitted that Diamond Shamrock had a situation that ensured that liquids were going to enter into the compressor system. Kerns recognized the fact that new operating procedures would have prevented this accident. Had the operating personnel opened the discharge valve, used the drain valves and drained the liquid, this accident would have been prevented. James Wyatt, a refinery superintendent, recognized that liquids in the vapor line to a compressor posed an extreme degree of risk to Diamond Shamrock personnel. Barry Glasgow, another refinery superintendent, agreed that liquids entering into a gas compressor could cause an explosion, which could injure employees and possibly cause the death of some people in that unit. Charlie Archibeque, the plant manager, recognized that liquids should be kept out of the compressor. Curtis Chamblee, the feed prep unit supervisor on the day shift, agreed that liquids being carried through the vapor line to the low stage suction drum posed an extreme degree of risk to Diamond Shamrock personnel.

In addition to the management, the operating personnel knew of the extreme risk involved when liquids enter into the compressor system. For example, Gary Schnaufer, an assistant operator in the hydrocracker unit who was responsible for the fractionator and the overhead accumulator on the day of the accident, said that when the compressor pulls in liquids, a major explosion occurs. Schnaufer was concerned about the liquid that he was sending to the feed prep unit. He went against the orders of his supervisor, Ron Morris, an operator in the hydrocracker unit, and sent the liquid to storage. Jay

Hayes, an assistant operator in the feed prep unit, was also concerned with the high level of liquids, but Morris told him not to send it to storage. Dennis Hunt, an operator helper in the hydrocracker unit, knew that Schnaufer was making a decision contrary to his supervisor's orders. Hunt knew that liquids in the compressor were dangerous and involved a safety risk. Stephen Hendricks, an operator in the feed prep unit, testified that any time in an oil refinery can be a dangerous time and start-up procedures were not considered normal operations. As a result, surprise incidents can occur.

In reviewing all the facts and circumstances objectively from Diamond Shamrock's standpoint, we find that the design of the refinery ensuring that liquids would go back into the compressor system involved an extreme degree of risk to others that greatly increased the likelihood of serious injury. In addition, everyone at the plant-from the Vice President and Plant Manager, Bob Kerns, down to the operator helpers—knew that introducing even a small amount of liquid into a compressor would result in an explosion. A petrochemical refinery is an inherently hazardous venture because the potential for disaster is enormous. *See Seminole Pipeline Co. v. Broad Leaf Partners, Inc.,* 979 S.W.2d 730, 742 (Tex.App.—Houston [14th Dist.] 1998, no pet.). In view of the highly dangerous character of a petrochemical refinery, Diamond Shamrock must "use a degree of care to prevent damage commensurate to the danger which it is its duty to avoid." *Id.* at 743 (quoting *Prudential Fire Ins. Co. v. United Gas Corp.,* 145 Tex. 257, 199 S.W.2d 767, 772–73 (1946)). Because Diamond Shamrock's actions involved an extreme degree of risk to its operating personnel, including Charlie Hall, there is legally sufficient evidence to support the first element of gross negligence.

■ In addition, viewing all of the evidence in the record, we find that the evidence is factually sufficient to support the jury's finding that Diamond Shamrock's action involved an extreme degree of risk to others that greatly increased the likelihood of serious injury. Although Bob Kerns testified that the start-up procedures did not necessarily have anything to do with causing this accident and that the bleeder valves on the discharge line were not that important, the evidence shows that if there would have been procedures in place to drain the discharge valves before starting up the No. 2 RLE compressor, this accident could have been prevented. The jury, as the trier of fact, judges the credibility of the witnesses, assigns the weight to be given their testimony, and resolves any conflicts or inconsistencies in the testimony. *See Gunn Buick, Inc. v. Rosano,* 907 S.W.2d 628, 630 (Tex.App.— San Antonio 1995, no writ). Because the jury resolved any conflicts in the expert testimony regarding Diamond Shamrock's actions and omissions involving an extreme degree of risk, we find that the evidence was factually sufficient to support the jury's verdict. In considering, weighing, and examining all of the evidence which is contrary to the jury's determination, we do not find the weight of the evidence to be wrong or unjust. As a result, there is factually sufficient evidence to support the first element of gross negligence.

2. Subjective Element of Gross Negligence: Conscious Indifference

■ Having found that the evidence is legally and factually sufficient to support the jury's finding that the actions and omissions of Diamond Shamrock involved an extreme degree of risk, we now review the evidence to determine if Diamond Shamrock had actual, subjective awareness of the risk involved, but never-

theless proceeded in conscious indifference to the rights, safety, or welfare of others. *See Ellender*, 968 S.W.2d at 921. Under the second element of gross negligence, "actual awareness" means that the defendant knew about the peril, but its acts or omissions demonstrated that it did not care. *See id.*

McAninch, Hall's expert witness, testified that Diamond Shamrock had subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference as to the rights, safety, and welfare of others. Specifically, McAninch testified that Diamond Shamrock proceeded with conscious indifference and demonstrated that it did not care by defectively designing a system that allowed liquids into the compressor, by having inadequate start-up procedures, by inadequately training its personnel, and by covering the drain valves with dirt.

Ellis Thornburg, an assistant operator assigned to the feed prep area, testified the employees in the feed prep unit had experienced problems with the check valve before the explosion occurred. According to Thornburg, the equipment had been written up to be fixed two times before the accident occurred and was not fixed until after the explosion. Steven Hendricks, an operator in the feed prep unit on the daylight shift, testified that if someone were to write up the check valve to be fixed, it would have to be written up on the work list. There were three copies of the work list-one copy stayed in the unit and two copies were sent to the unit supervisor. However, Hendricks testified he was not advised by Curtis Chamblee, the feed prep unit supervisor, to write up the check valve. Shannon Gillespie, a refinery superintendent, learned that somebody had written up the check valve to be fixed prior to April 1, 1996. Ken Sorenson, Diamond Shamrock's expert witness, admitted that

if Diamond Shamrock had been put on notice by some person that there was a problem with the check valve, then Diamond Shamrock would have had an awareness of the danger created by the potential problem with that specific check valve.

Thornburg further testified that Diamond Shamrock never trained the personnel to test the low stage check valve. Testing the check valve was not part of the start-up procedures. In addition, Diamond Shamrock never instructed or trained its employees to periodically test the discharge valve to make sure it was working properly. According to Thornburg, Diamond Shamrock never warned or communicated about the possibility that the check valve in the discharge line of the low stage compressor could actually fail. In addition, the discharge valve was not greased regularly, and as far as Thornburg knew, the discharge valve had never been greased. There were no procedures in place for feed prep personnel to check for liquids in the discharge line. The bleeder valves that would allow the liquid in the discharge line to be drained were covered with dirt and nobody knew they were there. Shannon Gillespie testified that there were no procedures in place to check the check valve on April 1, 1996. In addition, there were no procedures in place to check the spool area of the discharge line before the start-up of the RLE compressor to check and see if liquids were there. According to Ken Sorenson, Diamond Shamrock could have tested the discharge valve and check valve for an increase in pressure. If there was such an increase in pressure, then that would have indicated to Diamond Shamrock that there may have been a problem with the valves. After the explosion occurred, Diamond Shamrock placed new procedures into effect, which included testing the check valve and the discharge valve and draining the liquids from the discharge line.

Curtis Chamblee testified that there was no maintenance done on the check valve or the discharge valve that he was aware of during the time he worked in the feed prep unit. Chamblee also testified that he had never been aware of a situation where liquids had gotten past the check valve, beyond the discharge valve and into the discharge line. According to Chamblee, there was no need to look for liquids in the discharge line of the compressor.

Ken Sorenson testified that based upon a reasonable engineering probability the fire and explosion was the result of an unexpected and very unlikely combination of several circumstances that happened to come together at the same time. Specifically, the combination of the failed check valve and the leaking discharge valve allowed liquids to back flow down the discharge line toward the compressor while it was shut down, in conjunction with the fact that there was liquid being pumped into that line. According to Sorenson, "the accident goes away" if you take out any of these elements.

The evidence shows that Bob Kerns had first-hand knowledge of two prior compressor explosions that resulted from liquid in the vapor system. Kerns testified that in the early 1970s, Diamond Shamrock had two explosions in a gasoline plant compressor building that involved liquids in RLE compressors. The compressors in those accidents functioned the same as the No. 2 RLE compressors do today. Kerns testified that after the first explosion there was no re-piping or redesign at the gasoline plant compressor building. But after the second explosion, Kerns participated in redesigning the compressors by designing some bleeder systems that Diamond Shamrock thought would solve the problem. According to Kerns, the bleeder system was designed so that Diamond Shamrock could check the compressor prior to start-up to see if there were liquids in the lines. The bleeder valves were put in the system so that liquid could be bled off when the plant was operating. The personnel that worked on that unit was instructed to check the bleeders for liquids in the compressor system.

Kerns also testified about the differences in the explosion that occurred on April 1, 1996 and the explosions in the early 1970s. According to Kerns, the earlier explosion was caused by liquids getting into the compressor by condensing in the suction line and then pooling into the compressor due to cold weather. There was no check valve failure or leaking discharge valve during the 1970s explosion like there was in the April 1, 1996 explosion. Kerns testified that there were different circumstances, different hook-ups, and different causes between the earlier explosions and the April 1, 1996 explosion. According to Ken Sorenson, Diamond Shamrock's expert witness, the occurrence of some similar event with a similar result would be enough to put Diamond Shamrock on notice that it had a problem that needed correcting. However, the event would have to be similar enough to tie the two situations together.

 Having reviewed the evidence in a light most favorable to the jury's finding to determine if Diamond Shamrock had actual, subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others, we find that the evidence was legally sufficient to support the jury's finding. Corporate safety policies, or lack of them, can serve as the basis for a gross negligence finding. *See Louisiana Pacific Corp. v. Andrade*, 19 S.W.3d 245, 247 (Tex. 1999); *Ellender*, 968 S.W.2d at 924–25. For example, in *Mobil Oil Corp. v. Ellender*, the plaintiff produced evidence that Mobil had a detailed policy of monitoring,

testing, and warning its own employees to protect them from risks associated with exposure to benzene, but did not do so for contract workers. *See Ellender,* 968 S.W.2d at 924–25. The Texas Supreme Court concluded that this policy was legally sufficient evidence that Mobil knew of the extreme risks of benzene exposure, and despite this knowledge had an "unwritten practice or policy" of not warning or testing contract workers, which permitted the jury to infer that Mobil knew the risks of benzene exposure yet proceeded with conscious indifference toward the safety of contract workers. *See id.*

Here, Diamond Shamrock knew the risks involved when liquids entered into the compressor, yet proceeded with conscious indifference toward the safety of its operating personnel by defectively designing a system that allowed liquids into the compressor, by having inadequate start-up procedures, by inadequately training its personnel, and by covering the bleeder valves with dirt. For instance, the personnel that worked in the gasoline plant during the 1970s were instructed to check the bleeder valves for liquids in the compressor system, yet despite this knowledge, the personnel in this case were not trained or instructed how to do this. The evidence also shows that Diamond Shamrock was put on notice of the defective check valve and despite this knowledge, did not correct the problem. Because Diamond Shamrock was actually aware of the risk, yet proceeded with conscious indifference toward its personnel, the evidence is legally sufficient to support the second element of gross negligence.

Moreover, viewing all of the evidence in the record, we find that the evidence is factually sufficient to support the jury's finding that Diamond Shamrock had actual, subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others. Even though Ken Sorenson testified that the fire and explosion resulted from an unlikely and unexpected combination of circumstances, the evidence shows that Diamond Shamrock was put on notice of the defective check valve and that maintenance was not done on the check valve or the drain valve. In addition, although the evidence shows that the prior explosions were under different circumstances than the April 1, 1996 explosion, the evidence shows that Diamond Shamrock knew that the prior explosions were caused by liquids getting into the compressor and despite this knowledge, failed to properly train or instruct its personnel to look for liquids in the compressor system. As a result, the evidence establishes Diamond Shamrock knew about the risk involved, but its acts or omissions demonstrated that it did nothing to correct the problem. Because the jury resolved any conflicts in the testimony regarding Diamond Shamrock's conscious indifference to the rights, safety, and welfare of its personnel, we find that the evidence was factually sufficient to support the jury's verdict. In considering, weighing, and examining all of the evidence which is contrary to the jury's determination, we do not find the weight of the evidence to be wrong or unjust. Accordingly, there is factually sufficient evidence to support the second element of gross negligence.

Because the evidence is legally and factually sufficient to support the jury's finding of both the objective and subjective elements of gross negligence, we overrule this issue. We next turn to Hall's issues on appeal.

## APPLICABILITY OF PUNITIVE DAMAGES CAP

In her first issue, Hall complains that the trial court erred in capping her recov-

ery of punitive damages because chapter 41 of the Civil Practices and Remedies Code, which limits punitive damages, was not applicable to her cause of action. *See generally* TEX. CIV. PRAC. & REM.CODE ANN. § 41.001–.013 (Vernon 1997 & Vernon Supp.2001). Specifically, Hall contends that the legislature did not remove the "laundry list" exceptions to the statute until September 1, 1997. Because Hall's claim arose on April 9, 1996, the date of Charlie's death, Hall argues that two exceptions under section 42.002(b) exempted her cause of action from the statute; namely, (1) her lawsuit was a claim brought under the workers' compensation laws of this state (Title 5, Labor Code), and (2) her lawsuit was a claim to recover exemplary damages against an employer by the employee's beneficiaries in a death action arising out of the course and scope of employment where the employer was a subscriber under the workers' compensation laws of this state (Title 5, Labor Code).[1]

Section 41.002(a) provides that chapter 41 of the Civil Practices and Remedies Code applies to any action in which a claimant seeks exemplary damages relating to a cause of action. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.002(a) (Vernon Supp.2001). In this case, subsection (a) is not in dispute. To determine whether two

of the exceptions in subsection (b) apply to Hall's case, we need to review the legislative history of the statute. In 1995, the 74th Legislature enacted two amendments to Chapter 41 of the Civil Practices and Remedies Code. On April 20, 1995, the legislature enacted Senate Bill 25, which removed the laundry list of exceptions to section 41.002(b) of the Civil Practices and Remedies Code. The amendment provided:

> This chapter establishes the maximum exemplary damages that may be awarded in an action subject to this chapter, including an action for which exemplary damages are awarded under another law of this state. This chapter does not apply to the extent another law establishes a lower maximum amount of exemplary damages for a particular claim.

*See* Act of April 20, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 109 (amended 1997) (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 41.002(b) (Vernon Supp.2001)). All of the fifteen exceptions to subsection (b) of this statute were eliminated and the amendment to the statute became effective on September 1, 1995. On May 30, 1995, the legislature enacted Senate Bill 1, which included a conforming amendment to the April 20, 1995 amendment.[2] This amendment be-

---

1. *See* Act of May 30, 1995, 74th Leg., R.S., ch. 260, § 9, 1995 Tex. Gen. Laws 2207, 2474, *amended by* Act of May 21, 1997, 75th Leg., R.S., ch. 165, § 4.01, 1997 Tex. Gen. Laws 327, 328 (current version at TEX. CIV PRAC. & REM.CODE ANN. § 41.002(b) (Vernon 1997)).

2. SECTION 9. CONFORMING AMENDMENT: Subsection (b), Section 41.002, Civil Practice and Remedies Code, is amended to read as follows:
(b) This chapter does not apply to:
(1) an action brought under the Deceptive Trade Practices Consumer Protection Act (Subchapter E, Chapter 17, Business & Commerce Code) except as specifically provided in Section 17.50 of that Act;

(2) an action brought under Chapter 21, Insurance Code;
(3) an action brought under the worker's compensation laws of this state *(Title 5, Labor Code)* [Article 8036 et seq., Revised Statutes];
(4) an action to recover exemplary damages against an employer by the employee's beneficiaries in a death action arising out of the course and scope of employment where the employer is a subscriber under the workers' compensation laws of this state *(Title 5, Labor Code)* [Article 8036 et seq., Revised Statutes];
(5) an action brought under Chapter 246, Acts of the 63rd Legislature, Regular Session, 1973, Home Solicitation Transactions (Article

came effective on the May 30, 1995, the date it was passed. Hall argues that the May 30, 1995 amendment placed all of the fifteen exceptions back into the statute, so that when her lawsuit began accruing on April 9, 1996, two of the exceptions in subsection (b) applied to her case.

To determine whether the May 30, 1995 amendment placed the exceptions back into the statute and was then applicable to Hall's cause of action, we need to review and interpret the statute. Statutory interpretation presents a question of law. *See Bandera Indep. Sch. Dist. v. Hamilton*, 2 S.W.3d 367, 369 (Tex.App.— San Antonio 1999, pet. denied). Trial courts have no discretion when evaluating a question of law. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992); *In re Lambert*, 993 S.W.2d 123, 127 (Tex.App.— San Antonio 1999, no pet.). Accordingly, we give no particular deference to the trial court's findings. *See Hamilton*, 2 S.W.3d at 369. Instead, we independently review and evaluate the statute to determine its meaning.

The Code Construction Act guides courts in their search for legislative intent. *See generally* TEX. GOV'T CODE ANN.

§ 311.001–.032 (Vernon 1998). Specifically, the Act provides that if amendments to the same statute are enacted at the same session of the legislature, one amendment without reference to another, the amendments shall be harmonized so that effect may be given to each. *See* TEX. GOV'T CODE ANN. § 311.025(b) (Vernon 1998). If the amendments are irreconcilable, the latest date of enactment prevails. *See id.* Hall claims that since the May 30, 1995 amendment is later than the April 20, 1995, the May amendment, which includes the exceptions, should prevail.

However, the April 20, 1995 and the May 30, 1995 amendments to the statute are not irreconcilable. The May amendment was simply a conforming amendment that updated the statutory references within the subsection (b) exceptions for those cases to which the exceptions in subsection (b) would continue to apply, namely, to those causes of action that accrued prior to September 1, 1995. Because the amendments can be harmonized, the effect of the April amendment was to eliminate the exceptions previously set forth in subsection (b) for those causes of action arising after September 1, 1995.

5069–13.01 et seq., Vernon's Texas Civil Statutes);
(6) an action brought under Chapter 547, Acts of the 63rd Legislature, Regular Session, 1973, Debt Collection Practices (Article 5069–11.01 et seq., Vernon's Texas Civil Statutes);
(7) an action brought under Chapter 54, 91, or 92, Property Code;
(8) an action brought under the Texas Manufactured Housing Standards Act (Article 5221f, Vernon's Texas Civil Statutes);
(9) an action brought under the Texas Motor Vehicle Commission Code (Article 4413(36), Vernon's Texas Civil Statutes);
(10) an action brought under [the Texas Proprietary School Act] Chapter *132* [32], Education Code;
(11) an action brought under Section 9.507 or Section 27.01, Business & Commerce Code;

(12) an action brought under Chapter 36, Family Code;
(13) an action brought under the Health Spa Act (Article 5221l, Vernon's Texas Civil Statutes);
(14) an action brought under the Business Opportunity Act (Article 5069–16.01 et seq., Vernon's Texas Civil Statutes);
(15) an action brought under *Chapter 221, Property Code* [the Texas Timeshare Act (Article 6583c, Vernon's Texas Civil Statutes)].
*See* Act of May 30, 1995, 74th Leg., R.S., ch. 260, § 9, 1995 Tex. Gen. Laws 2207, 2474, *amended by* Act of May 21, 1997, 75th Leg., R.S., ch. 165, § 4.01, 1997 Tex. Gen. Laws 327, 328.

Accordingly, because Hall's cause of action arose after this date, the subsection (b) laundry list exceptions are not applicable. Since the exceptions are not applicable, the trial court did not err when it applied the exemplary damages statute to Hall's case. As a result, we overrule this issue.

### CONSTITUTIONALITY OF PUNITIVE DAMAGES CAP

In her second issue, Hall complains that Section 41.008 of Civil Practices and Remedies Code is unconstitutional as applied by the trial court in this case.[3] Hall brought her cause of action under Article 16, Section 26 of the Texas Constitution, which provides:

> Every person, corporation, or company, that may commit a homicide, through a wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide.

*See* TEX. CONST. art. XVI, § 26. Specifically, Hall contends that chapter 41 restricts her common law cause of action and unreasonably restricts her cause of action for exemplary damages under the open courts provision of the Texas constitution.

The open courts provision proposed in article I, section 13 of the Texas Constitution provides that "[a]ll courts shall be open, and every person for an injury done him, and his lands, goods,

person or reputation shall have a remedy by due course of law." *See* TEX. CONST. art. I, § 13. The open courts provision prevents the legislature from abrogating the right to assert a well-established common law cause of action unless the reason for the legislature's action outweighs the litigants' constitutional right of redress. *See Owens Corning v. Carter*, 997 S.W.2d 560, 573 (Tex.1999), *cert. denied*, 528 U.S. 1005, 120 S.Ct. 500, 145 L.Ed.2d 386 (1999). Therefore, a litigant's cause of action cannot be effectively abrogated by the legislature absent a showing that the legislative basis outweighs the denial of a constitutionally guaranteed right. *See Schorp v. Baptist Memorial Health System*, 5 S.W.3d 727, 737 (Tex.App.—San Antonio 1999, no pet.). The open courts provision does not permit a well-established common law cause of action to be restricted by statute in a way that is unreasonable or arbitrary in view of the statute's purpose. *See Earle v. Ratliff*, 998 S.W.2d 882, 889 (Tex.1999). Thus, to establish an open courts violation in this context, Hall must show that: (1) she has a well-recognized common law cause of action that is being restricted; and (2) the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute. *See Owens Corning*, 997 S.W.2d at 573. In applying this test, we consider both the general purpose of the statute and the extent to which the litigant's right is affected. *See id.*

---

3. Section 41.008 provides a limitation on recovery:

(a) In an action in which a claimant seeks recovery of exemplary damages, the trier of fact shall determine the amount of economic damages separately from the amount of other compensatory damages.

(b) Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:

(1)(A) two times the amount of economic damages; plus

(B) an amount equal to any non-economic damages found by the jury, not to exceed $750,000; or

(2) $200,000.

*See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008 (Vernon 1997).

To construe a statute and determine its purpose, we consider the "object sought to be obtained." *See* TEX. GOV'T CODE ANN. § 311.023 (Vernon 1998). One of the purposes of the 1987 tort reform legislation was to make the Texas civil justice system more predictable. *See Seminole Pipeline Co. v. Broad Leaf Partners*, 979 S.W.2d 730, 751 (Tex.App.—Houston [14th Dist.] 1998, no pet.); *see also* John T. Montford and Will G. Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System*, 25 Hous. L.Rev. 59, 69 (1988). Presumably, the cap found in section 41.008 was to provide a measure of predictability by narrowing the range of punitive damages that might be awarded to a plaintiff. *See Seminole*, 979 S.W.2d at 751.

In addition to considering the general purpose of the statute, we also consider the extent to which Hall's right is affected. The purpose of punitive damages is not to restore the plaintiff's property or compensate her for her loss, but rather, punitive damages are levied for the public purpose of punishment and deterrence. *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex.1994); *see also* TEX. CIV. PRAC. & REM.CODE § 41.001(5) (Vernon 1997) (defining exemplary damages as any damages awarded as a penalty or by way of punishment). While Hall may be motivated to pursue this public purpose in the hope of securing punitive damages, such proceeds are a windfall and not a matter of right. *See Moriel*, 879 S.W.2d at 17; *Seminole*, 979 S.W.2d at 758. The constitutional provisions cited by Hall serves to protect only private rights and interests. Because the statutory cap on punitive damages affects only public punishment interests, it does not infringe upon any constitutional right held by Hall. *See Seminole*, 979 S.W.2d at 758. Because the exemplary damages statute is constitu-

tional as applied in Hall's case, we overrule this issue.

## WAIVER

In her third issue, Hall complains that the trial court erred by capping the jury verdict at $200,000 in accordance with section 41.008(b)(2) because Diamond Shamrock waived any right to assert the statutory damages cap on punitive damages since they did not affirmatively plead the defense. In its pleadings, Diamond Shamrock raised the punitive damages cap by stating "a recovery of exemplary damages, if any, is limited in accordance with section 41.008." Hall argues that Diamond Shamrock did not assert in its pleadings whether the cap sought to be applied was to subsection (b)(1) or subsection (b)(2) of section 41.008.

However, the exemplary damages cap is not an affirmative defense. *See Seminole*, 979 S.W.2d at 759. To successfully impose an affirmative defense, the proponent must plead and prove his defense. *See id.* Here, the statutory cap applies to every defendant other than those who specifically intend to cause substantial injury or who commit an intentional tort. *See id.* If an intentional tort and/or malice is not pled and proven by the plaintiff, the cap automatically applies. *See id.* In this case, Hall had the burden to prove by clear and convincing evidence the elements of her claim for gross negligence. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(b) (Vernon 1997) (providing that "the claimant must prove by clear and convincing evidence the elements of exemplary damages"). The burden of proof may not be shifted to the defendant or satisfied by evidence of ordinary negligence, bad faith, or a deceptive trade practice. *See id.* Because Diamond Shamrock had nothing to prove, it had nothing to plead. *See Seminole*, 979 S.W.2d at 759.

As a result, Diamond Shamrock did not waive any right to assert the punitive damages cap because the statute is not an affirmative defense. Accordingly, we overrule this issue.

### EXCLUSION OF EVIDENCE FOR COMPENSATORY DAMAGES

In her fourth issue, Hall complains that the trial court erred by capping the jury verdict at $200,000 in accordance with section 41.008(b)(2) because Diamond Shamrock invited the trial court to commit error when it excluded evidence and issues regarding the economic and non-economic damages required by section 41.008(b)(1). Specifically, Hall contends that Diamond Shamrock advanced the position to the trial court that the economic and noneconomic damages were irrelevant to the issue of liability and the amount of punitive damages because they were not recoverable, and not being recoverable, the mandatory cap of $200,000 would have to be applied. Having succeeded in excluding the evidence and findings required by section 41.008(a), Diamond Shamrock then asserted there were no findings on which to apply the subsection (b)(1) cap, leaving only the $200,000 limit of subsection (b)(2). Hall argues that because Diamond Shamrock invited the court to commit error, Diamond Shamrock should not be permitted to benefit from such action.

 In determining whether Diamond Shamrock invited the trial court to commit error, we first determine whether the trial court erred in excluding the evidence of compensatory damages. The admission or exclusion of evidence is a matter within the trial court's discretion. *See City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to guiding principles. *See Goode v. Shouk-*

*feh,* 943 S.W.2d 441, 446 (Tex.1997); *Cruz v. Hinojosa,* 12 S.W.3d 545, 549 (Tex. App.—San Antonio 1999, pet. denied). To obtain a reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was in error and that the error was calculated to cause and probably did cause the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1; *Alvarado,* 897 S.W.2d at 753. The complaining party is not required to prove that "but for" the exclusion of evidence, a different judgment would have necessarily resulted. *See McCraw v. Maris,* 828 S.W.2d 756, 758 (Tex.1992). Instead, the complaining party is only required to show that the exclusion of evidence probably resulted in the rendition of an improper judgment. *See id.* To determine whether the error probably resulted in an improper judgment, we must review the entire record. *See Alvarado,* 897 S.W.2d at 754; *Cruz,* 12 S.W.3d at 549.

In the instant case, Hall's dilemma was that under the Workman's Compensation Act, Hall was only allowed a lawsuit for punitive damages, and was therefore not required to plead actual or compensatory damages. *Cf. Wright v. Gifford–Hill & Co., Inc.,* 725 S.W.2d 712, 714 (Tex.1987) (holding that in an action for exemplary damages for the death of an employee covered by workers' compensation, the plaintiff is not required to plead and submit special issues on actual damages, since actual damages cannot be recovered under the Workers' Compensation Act). Yet, because the punitive damages cap applied to her case, the statute allows for either a formula that includes economic and non-economic damages or just $200,000. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008 (Vernon 1997). Despite the apparent practical predicament between not requiring compensatory damages to be plead and

adducing proof related to the capping formula, Hall offered evidence of the economic and noneconomic damages due to the loss of her husband. Diamond Shamrock sought to prohibit Hall from offering any evidence of economic and noneconomic damages by a motion in limine. The trial court granted Diamond Shamrock's motion, which specifically prohibited Hall from offering "[a]ny reference to or evidence of any claim for damages other than the punitive damages specifically allowable under Chapter 41 of the Texas Civil Practices Code." During the hearing on this motion, the trial court stated, "the only evidence I'm going to let in is evidence that is relevant to the charge."

Moreover, during the trial, Hall made an offer of proof and presented a summary of the evidence in question and answer form out of the presence of the jury, which the trial court excluded. *See* TEX.R. EVID. 103(a)(2). Hall's offer of proof included evidence of the following economic and noneconomic damages: (1) Burial costs in the amount of $7,800; (2) Medical expenses in the amount of $58,641; (3) Past and future lost wages in the amount of $623,000; (4) Loss of inheritance in the amount of $161,000; (5) Loss of care, support, services, advice, and counsel in the amount of $1,460,000; (6) Charles's physical pain in the amount of $9,000; (7) Charles's mental anguish in the amount of $9,000; (8) Hall's mental anguish in the amount of $365,000; (9) Charles's disfigurement that he sustained until the date of his death in the amount of $1,000; and (10) Charles's physical impairment until the date of his death in the amount of $1,000. After Hall made her offer of proof, Diamond Shamrock objected to the evidence on grounds of relevancy. The trial court sustained Diamond Shamrock's objections and excluded the evidence.

■ To be relevant, the proposed testimony must be sufficiently tied to the facts of the case that will aid the jury in reaching a factual dispute. *See E.I. du Pont de Nemours and Co., Inc. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995). Here, the evidence of compensatory damages is relevant because the jury needs this evidence to calculate the punitive damages using the formula pursuant to section 41.008(b)(1). In her pleadings, Hall prayed for an award of exemplary damages as allowed by law. In order to determine what exemplary damages are allowed by law, we need to review the statute. Section 41.008(a) requires a jury to determine the amount of economic damages separately from the amount of other compensatory damages when a claimant seeks a recovery of exemplary damages. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008(a) (Vernon 1997). These findings are necessary because the formula in section 41.008(b) is based on those findings. *See id.* § 41.008(b). Therefore, by seeking to recover an award of exemplary damages, Hall should be permitted to introduce evidence and obtain jury findings as to the amount of economic and noneconomic damages.

■ Because the evidence of compensatory damages was relevant to Hall's cause of action, the trial court committed error which resulted in an improper judgment. *See Alvarado,* 897 S.W.2d at 753. As a result of this error, there was a substantial discrepancy between the amount Hall was actually awarded and the amount she could have been awarded if the evidence of compensatory damages had been included in calculating her damages under the formula in section 41.008. Because this error resulted in an improper judgment, the trial court abused its discretion when it excluded the evidence. Therefore, we sustain this issue.

CONCLUSION

Having sustained Hall's issue on the exclusion of evidence of compensatory damages, we need not address Hall's remaining issue or any of Diamond Shamrock's remaining issues in its cross-appeal. Accordingly, we reverse the judgment of the trial court and remand the cause for a new trial.

PAUL W. GREEN, Justice, dissents.

Dissenting opinion by: PAUL W. GREEN, Justice.

I respectfully dissent because the plaintiff, Donna Hall, presented legally insufficient evidence to support the jury's finding that Diamond Shamrock Refining Company, L.P. ("Diamond Shamrock") was grossly negligent.

As pointed out by the majority, the standard for determining gross negligence involves objective and subjective components. *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 23–24 (Tex.1994). Objectively, the act of negligence must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others. *Id.* But in addition to that, the actor must have actual, subjective awareness of the risk involved and proceed nonetheless in conscious indifference to the rights, safety, or welfare of others. *Id.*

In a no evidence review, we consider all evidence in the light most favorable to the jury's finding. The evidence can be summarized as follows:

- Diamond Shamrock knew that allowing liquid hydrocarbons to leak into the RLE gas compressors could cause an explosion and fire.
- Diamond Shamrock designed the Feed Prep Unit (FPU), which housed the RLE compressors, in a way that allowed liquid hydrocarbons to flow through a portion of the system.

- Diamond Shamrock failed to provide adequate training and procedures for system start-up.
- Diamond Shamrock failed to utilize an existing bleeder valve that could have prevented the explosion and fire.

From this evidence, I agree the jury might reasonably have found that the activity posed an extreme degree of risk, thus satisfying the objective component of the gross negligence standard.

However, the evidence does not support a finding on the subjective component. While it may be true that Diamond Shamrock personnel knew that allowing liquids to leak into the gas compressors could cause an explosion, there is no evidence that anyone within the company had "actual, subjective awareness" the system as designed would permit this to happen and, knowing this, proceeded indifferently in the face of this knowledge.

In discussing the subjective component of the gross negligence standard, the supreme court in *Louisiana–Pacific Corp. v. Andrade,* 19 S.W.3d 245 (Tex.1999) explained that "what separates ordinary negligence from gross negligence is the defendant's state of mind; in other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care." *Id.* at 246–47 (citing *Williams v. Steves Indus., Inc.,* 699 S.W.2d 570, 573 (Tex. 1985) and *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981)). The evidence detailed in the majority's opinion is perhaps sufficient to show Diamond Shamrock committed acts and omissions of ordinary negligence, but it fails to demonstrate these acts displayed a corporate state of mind of indifference to peril that elevates the conduct from negligence to gross negligence.

Because the majority fails to render judgment in favor of Diamond Shamrock in light of Hall's failure to prove gross negligence, I dissent.